**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CONNIE SHIVNER, Individually and as
Personal Representative of the Wrongful
Death Estate of John Shivner, Deceased,

        Plaintiff,

v.                                        No. CIV 20-0497 RB/CG

CORRVALUES, LLC, GILA REGIONAL
MEDICAL CENTER, BOARD OF TRUSTEES
OF GILA REGIONAL MEDICAL CENTER,
BOARD OF COUNTY COMMISSIONERS OF
GRANT COUNTY, GRANT COUNTY DETENTION
CENTER, JOHN/JANE DOES I AND JOHN/JANE
DOES II, Individually and in his/her official capacity
as an employee of Grant County Detention Center, Gila
Regional Medical Center, and/or CorrValues, LLC,

        Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Decedent John Shivner was arrested on December 26, 2017, and immediately underwent surgery due to a gunshot wound in his shoulder. On December 31, he was released into the custody of the Grant County Detention Center (GCDC). Shivner received follow-up outpatient shoulder surgery on February 12, 2018. During his recovery at the GCDC, Shivner's health deteriorated, and he was transported to the Gila Regional Medical Center (GRMC) on February 16, 2018. GRMC staff admitted Shivner for constipation, dehydration, nausea, and vomiting. Almost 16 hours later, he went into respiratory failure. Exploratory surgery revealed total ischemic bowel, and the surgeon performed a colectomy. During recovery, Shivner contracted pneumonia and refused respiratory support measures. He died on February 20, 2018.

Shivner's wife, Connie Shivner (Plaintiff), brings a lawsuit against the Board of County

Commissioners of the County of Grant (the Board), CorrValues, LLC (CorrValues), GRMC and the GRMC Board of Trustees (the GRMC Defendants), and John/Jane Doe officers and staff of GCDC, GRMC, and CorrValues. Plaintiff has been represented by counsel during the majority of this lawsuit, but her attorneys withdrew in October 2021, after the deadline for Plaintiff to identify expert witnesses had passed. Defendants filed three motions for summary judgment in December 2021, basing them largely on Plaintiff's failure to submit any expert testimony. Plaintiff did not respond to the motions.

On February 17, 2022, Cathryn Wallace entered a notice of appearance on behalf of Plaintiff. On the same date, Plaintiff filed a motion for leave to file responses to the motions for summary judgment, citing new lay witness testimony that she believes will create genuine factual disputes. Defendants oppose the motion. Having considered the parties' arguments and evidence before the Court, the Court will **deny** the motion to extend, **grant** the motions for summary judgment, and **dismiss** this lawsuit.

## I.     Motion to Extend

In her motion to extend, Plaintiff seeks an extension of time to "present additional factual information and evidence . . . to counter" Defendants' summary judgment motions. (Doc. 91 at 1.) A recitation of the procedural history of this case is in order.

Plaintiff filed her lawsuit in state court on February 19, 2020. (*See* Doc. 1-A at 1.) Defendants removed the matter to this Court on May 22, 2020. (Doc. 1 at 1.) United States Chief Magistrate Judge Carmen Garza held a status conference with the parties on June 23, 2020. (Doc. 10.) Cathryn Wallace, who at that time was with the Lopez & Associates law firm out of Silver City, New Mexico, was one of three attorneys who appeared at the status conference on behalf of Plaintiff. (*See id.*; Doc. 96 at 2.) The other two attorneys included William Perkins, also of Lopez

& Associates, and Dathan Weems, of Dathan L. Weems Attorney at Law in Albuquerque. Wallace had not officially entered an appearance in the case. (*See* Doc. 96 at 2.) Pursuant to D.N.M. LR-Civ. 83.4(a), which mandates that "[t]o participate in a pending proceeding, an attorney must enter an appearance or obtain leave of the Court[,]" Judge Garza advised Wallace "to enter her appearance before proceeding with her representation of Plaintiff." (Doc. 10.) Due to a variety of health and workload concerns, and because of difficulties being admitted to federal practice, Wallace asserts that she stepped back from her representation of Plaintiff.[1] (Doc. 96 at 2.) Perkins, Weems, and another attorney from the Weems firm continued to represent Plaintiff. (*See* Docket.)

Plaintiff filed a First Amended Complaint in July 2020, and the Board moved to dismiss in August 2020. (*See* Docs. 28; 33.) The Court granted the motion in part in an Opinion entered March 18, 2021. (Doc. 42.) Plaintiff filed her Second Amended Complaint March 24, 2021. (Doc. 44 (SAC).) Judge Garza held a Rule 16 Scheduling Conference on May 20, 2021, and set the "case on a 210-day discovery schedule, with discovery to conclude by December 1, 2021." (Doc. 53.) The Scheduling Order set a deadline of September 1, 2021, for "Plaintiff to identify in writing any expert witness to be used by Plaintiff at trial and to provide expert reports pursuant to [Federal Rule of Civil Procedure] 26(a)(2)(B) . . . ." (Doc. 55 at 1.) The Court set pretrial conferences for September and October 2022, and a jury trial beginning November 28, 2022. (Docs. 58–60.) Judge Garza held a status conference on July 15, 2021, and the parties "agreed that discovery [was] proceeding as scheduled." (Doc. 62.)

On October 4, 2021, the Dathan Weems Law Firm moved to withdraw as counsel for Plaintiff, explaining that "Plaintiff no longer wishes for [the firm] to represent her in this matter."

---

[1] Wallace made this assertion in her reply brief. (Doc. 96 at 2.) She did not submit an affidavit in support. Defendants express some doubt regarding whether Wallace continued to participate in the lawsuit, as her name appears on two later-filed documents. (*See, e.g.*, Docs. 93 at 2; 94 at 5 n.1; 95 at 2 (all citing Docs. 8; 52).)

(Doc. 68 at 1.) Judge Garza granted the motion. (Doc. 69.) On October 6, 2021, William Perkins filed a motion to withdraw, citing the same reason. (Doc. 70 at 1.) Judge Garza denied the motion without prejudice for failure to comply with D.N.M. LR-Civ. 83.8(a). (Doc. 71.) Judge Garza held a telephonic status conference on October 8, 2021. (Doc. 72.) Perkins and Plaintiff were both present. (*See id.*) Judge Garza "asked counsel the status of discovery." (*Id.*) "Counsel stated that the parties have exchanged written discovery, that Plaintiff's deposition is currently scheduled for November 19, 2021, and that Defendants do not anticipate conducting any other depositions." (*Id.*) Neither Plaintiff nor Perkins mentioned needing more time to secure an expert. (*See id.*) Judge Garza explained to "Plaintiff that, if she were to proceed *pro se* in this matter, the Court would be required to hold her to the same rules of procedure as an attorney practicing before this Court." (*Id.*) Plaintiff stated that she understood. (*Id.*) Perkins re-filed his motion to withdraw as counsel on October 14, 2021, and Judge Garza granted it the next day. (Docs. 74–75.)

Judge Garza held another status conference on December 7, 2021. (Doc. 79.) Plaintiff appeared and did not request additional time for discovery or to secure an expert. (*See id.*) Defendants filed their motions for summary judgment on December 30, 2021, the deadline for pretrial motions. (*See* Docs. 55 at 2; 80–82.) When Plaintiff failed to respond to the motions, Defendants filed notices that briefing was complete. (Docs. 84–86.)

On February 8, 2022, at Wallace's request, Judge Garza held a status conference, at which both Plaintiff and Wallace appeared. (*See* Doc. 89.) Wallace "explained she was seeking an extension of time to respond to the dispositive motions currently pending . . . ." (*Id.*) Judge Garza advised her to file a motion. (*Id.*) Wallace entered her appearance on February 17, 2022, and filed her motion to extend on the same day. (Docs. 90–91.) Plaintiff requests leave to respond out of

time to the dispositive motions to present "additional evidence very recently obtained that may rebut the facts alleged in the . . . Motions for Summary Judgment." (Doc. 91 at 2.)

Under Federal Rule of Civil Procedure 6(b), "the court may, for good cause, extend the time" for Plaintiff to respond "on [a] motion made after the time has expired if [she] failed to act because of excusable neglect." Fed. R. Civ. 6(b)(1)(B). "[A] finding of excusable neglect under Rule 6(b)[(1)(B)] requires both a demonstration of good faith by the parties seeking the enlargement and also it must appear that there was a reasonable basis for not complying within the specified period." *Est. of Anderson v. Denny's Inc.*, 291 F.R.D. 622, 631 (D.N.M. 2013) (quoting *In re Four Seasons Sec. Laws Litig.*, 493 F.2d 1288, 1290 (10th Cir. 1974)) (subsequent citation omitted). "[I]t is well established that inadvertence, ignorance of the rules, and mistakes construing the rules do not constitute excusable neglect for purposes of Rule 6(b)." *Id.* at 631–32 (quoting *Quigley v. Rosenthal*, 427 F.3d 1232, 1238 (10th Cir. 2005)). The Court examines several factors in deciding whether Plaintiff has shown excusable neglect, "including: (i) the danger of prejudice to the opposing party; (ii) the length of the delay and its potential impact on the judicial proceedings; (iii) the reason for the delay, including whether it was within the reasonable control of the movant; and (iv) whether the movant acted in good faith." *Id.* at 632 (citing *Schupper v. Edie*, 193 F. App'x. 744, 746 (10th Cir. 2006)) (subsequent citation omitted). Defendants argue that Plaintiff has shown neither good cause nor excusable neglect for her failure to timely respond to the motions. (*See* Docs. 93 at 3–5; 94 at 2–6; 95 at 3–8.)

### **Prejudice**

CorrValues contends that Defendants would be prejudiced by allowing Plaintiff's response when she relies on affidavits from individuals "whom Defendants had (and will have) no opportunity to depose, discovery having closed December 1, 2021." (Doc. 95 at 7–8.) The Court

agrees that Defendants will suffer some prejudice from Plaintiff's late submission of the affidavits after the close of discovery. Not only will they not have the opportunity to depose the late-identified witnesses, but Defendants might want to have their experts reevaluate the evidence in light of the affidavits.

The Court also considers that although Plaintiff does not explicitly seek permission to modify the scheduling order in her motion, she alludes to the possibility of seeking a modification in her reply brief. (*See* Doc. 96 at 6 ("The newly-obtained evidence (*and further investigation*), may show that the dysfunction inherent in the working environment of the [GCDC] caused or contributed to Mr. Shivner's death."), and at 9 (Plaintiff "believes the statements are material as the evidence – *as well as additional investigation, if allowed by the Court* – could lead an expert witness to reconsider causation and liability in this case.") (emphasis added).) Should the Court grant Plaintiff's motion to extend, it appears that Plaintiff may later seek to reopen discovery, adding significant delay in this case. This factor weighs slightly against allowing the extension.

**Length of Delay**

The delay here is not significant. Plaintiff's responses to the summary judgment motions were due on January 13, 2022, and she filed her motion to extend on February 17, 2022, a little more than one month after the deadline passed. CorrValues argues that if the Court grants the motion to extend, it will result in a delay "of at least one to two months, and would require resetting pretrial order deadlines." (Doc. 95 at 7.) Because there have been no lengthy delays in this matter to date, the Court finds this factor weighs slightly in favor of granting the motion.

**Reason for Delay**

Plaintiff explains the delay as follows. Wallace left the Lopez & Associates law firm and opened her own firm in January 2022. (Doc. 91 at 4.) On January 30, 2022, Wallace met with a

potential client, Nathaneal Fischer, who worked in a supervisory capacity at the GCDC. (*Id.*) During that interview, Fischer told Wallace that he witnessed Shivner's final days at the GCDC. (*Id.* at 5.) Wallace stated that Fischer and a second, unnamed witness shared details of Shivner's symptoms and attempts to seek medical attention. (*Id.* at 5–6.) Plaintiff asserts that although her previous counsel "was extremely diligent in his efforts to obtain eye-witness testimony of this kind," he "could not possibly have obtained this information without interviewing (under oath and subject to cross examination) each and every person employed by the GCDC or by CorrValues, LLC between February 12 and February 16, 2018." (*Id.* at 6.) "The fact that the undersigned counsel obtained this information . . . was quite literally a fluke of the kind that occurs occasionally in small communities like Silver City . . . ." (*Id.*)

Defendants understandably respond with some incredulity. Plaintiff claims that she could not have uncovered these late witnesses, as prior counsel would have had to depose countless staff members under oath. Yet one of Plaintiff's "new" witnesses, Fischer, was listed as the Reporting Officer on the Incident Report concerning Shivner's transport to the hospital. (Doc. 80-C at 53.) The reporting employee stated that he "was notified by Sgt. Fischer that inmate Shivner needed to be transported to GRMC per medical." (*Id.*) One of the CorrValues contractors also referenced Sgt. Fischer in a Progress Note dated February 16, 2018. (*Id.* at 35 (noting that Dr. Mercado, a CorrValues contractor, directed medical staff to send Shivner to ER if he cannot have a bowel movement; "Notified Sgt. Fisher, will get someone to come in if need arises.").) Given that Fischer was obviously involved with Shivner during his final hours at the GCDC, it is unclear why Plaintiff's prior counsel failed to depose him.[2]

---

[2] Another of Plaintiff's witnesses, Javier Jurado, is referenced in an incident report regarding Shivner's transport for a follow-up medical appointment. (Doc. 80-C at 25.)

As noted by CorrValues, "over a nearly two-year period, Plaintiff [and her prior counsel] failed to take a single deposition; disclosed no expert witnesses; and propounded only limited written discovery." (Doc. 95 at 5.) CorrValues questions Plaintiff's claims of difficulty in discovering such lay witness evidence, as "Plaintiff herself *disclosed multiple purported witnesses of Shivner's alleged pain complaints* and claimed that there were such witnesses from the outset of litigation." (*Id.* at 6 (citing SAC ¶ 41).) It also explains that "Plaintiff could easily have narrowed potential deponents through written discovery; for instance, through serving an interrogatory seeking identification of prison supervisors working shifts during the dates" following Shivner's second surgery. (*Id.*) The Board, in its brief, agrees with CorrValues's position. (*See* Doc. 94 at 4–5.) "Plaintiff contends that one of the fact witnesses . . . was a former [GCDC] employee who was senior enough that . . . he was 'in charge of all [GCDC] facility employees.'" (*Id.* at 4 (quoting Doc. 91 at 5).) "While Plaintiff's counsel now paints a picture of a herculean effort that it would have taken to uncover this witness through the discovery process," Plaintiff failed to make the type of "rudimentary discovery request" (for example, a request "seeking identification of the few officials in charge of the facility" from February 12–16) that "almost certainly would have uncovered this same witness many months ago and in a timely manner." (*Id.* at 4–5.) Plaintiff was represented by counsel "throughout the majority of these proceedings, including when the time to identify an expert expired." (*Id.* at 5.) Thus, even her later pro se status does not explain her failure to conduct basic fact discovery. (*See id.*)

The GRMC Defendants question allowing a late response due to Plaintiff's "new" counsel's late and *unintentional* contact with one of the fact witnesses. (*See* Doc. 93 at 3.) Plaintiff fails to cite authority to show that it is appropriate to allow the late admission of discovery or briefing due not to the diligence of a party, but to "a fluke" by someone outside of the litigation,

particularly where the party had done so little during discovery. Plaintiff emphasizes that her prior counsel's location in Albuquerque somehow contributed to the inability to uncover testimony of the kind she came upon so late. (*See* Doc. 91 at 6.) Presumably, she refers here to the attorneys with the Albuquerque-based Dathan Weems firm. But until October 15, 2021, Plaintiff was also represented by Wallace's previous partner (Perkins) who also practiced at the Lopez & Associates firm located in Silver City, the same small community where Wallace herself now practices.

In sum, the Court finds that Plaintiff has not shown any good reason for the delay here. She did not diligently pursue discovery during the appropriate time, either when she had counsel or when she was pro se. Had she done so, there is every reason to believe that she had the ability to discover these "new" witnesses within the applicable deadlines. This factor weighs heavily in favor of denying her motion to extend.

### **Good Faith**

No Defendant makes any real argument that Plaintiff did not act in good faith. CorrValues notes, though, that while it "has no evidence of Plaintiff's bad faith," her "near-total failure to participate in prosecuting her case until this late hour shows no excusable neglect." (Doc. 95 at 8 (citation omitted).) Still, the Court finds that this factor weighs in favor of granting the motion.

On balance, the Court finds that the factors weigh against allowing Plaintiff's requested extension. "The most important factor is the third; an inadequate explanation for delay may, by itself, be sufficient to reject a finding of excusable neglect." *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1253 (10th Cir. 2017) (citing *United States v. Torres*, 372 F.3d 1159, 1163 (10th Cir. 2004)). Plaintiff's lack of diligence during discovery—whether intentional or a "poor tactical decision"— does not constitute excusable neglect. *See Lewis v. Herrman's Excavating, Inc.*, 200 F.R.D. 657, 660 (D. Kan. 2001). The Court will deny her motion to extend.

## II.     Motions for Summary Judgment

### A.     Legal Standards

#### 1.     Summary Judgment Standard

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckab*y, 902 F.3d 1136, 1143 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cnty. Sheriff's Off.*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* at 1107 (quotation and citation omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

#### 2.     Relevant Local Rules

Pursuant to Local Rule 56, the party moving for summary judgment "must set out a concise

statement of all of the material facts as to which the movant contends no genuine issue exists." D.N.M. LR-Civ. 56(b). The movant must number the facts "and must refer with particularity to those portions of the record upon which the movant relies." *Id.* In return, the non-moving party must also provide "a concise statement of the material facts . . . as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed." *Id.* "**All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.**" *Id.* (emphasis added).

Defendants each provided a statement of Undisputed Material Facts. (*See* Docs. 80 at 3–8; 81 at 3–4; 82 at 2–8.) Plaintiff failed to timely respond to any of Defendants' motions. Under this District's local rules, Plaintiff's responses were due 14 days after Defendants filed the motions. *See* D.N.M. LR-Civ. 7.4(a). Her failure "to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M. LR-Civ. 7.1(b). Summary judgment would not be proper, however, "merely because [Plaintiff] failed to file a response." *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) "Before the burden shifts to the nonmoving party to demonstrate a genuine issue, the moving party must meet its 'initial responsibility' of demonstrating that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law." *Id.* (citation omitted). Thus, the Court will consider the merits of Defendants' motions. Moreover, as discussed in its analysis below, the Court finds that even if it had allowed Plaintiff to offer the lay witness affidavits attached to her motion to extend, she fails to create a genuine factual dispute sufficient to withstand Defendants' motions.

**B.      Statement of Facts**

**1.      Shivner's illness and death**

Shivner was arrested on December 26, 2017. (SAC ¶ 36.) He was initially transported to a Texas medical facility due to a gunshot wound to his shoulder. (*Id.*) Shivner was discharged with several prescriptions, including Tylenol 3 (Tylenol with codeine); docusate, a stool softener; and a multivitamin with iron. (*Id.* ¶ 38; Docs. 80-A ¶ 14; 80-C at 51–52.[3]) Shivner was transferred to GCDC as a pretrial detainee on December 31, 2017. (SAC ¶ 37.) On that date, Shivner complained that he had not had a bowel movement for five days. (Doc. 80-A ¶ 14.) Both Tylenol 3 (an opioid) and the multivitamin can cause constipation, so CorrValues medical staff[4] modified his prescriptions to address his complaint. (*See id.* ¶¶ 10, 14.) They terminated the Tylenol 3 prescription (substituting regular Tylenol) and doubled the "dose of stool softener for weeks after that prescription would otherwise have terminated . . . ." (*Id.* ¶ 14; *see also* Doc. 80-C at 27–33.)

GCDC staff took Shivner for follow-up appointments on January 16 and January 30, 2018, without issue. (Doc. 80-C at 24–25.) Shivner had follow-up outpatient shoulder surgery on February 12, 2018. (*Id.* at 26.) The surgeon did not note any complaints of constipation or bowel pain. (Doc. 80-D at 9–10.) Shivner received an anesthetic and narcotics for his surgery. (Doc. 80-A ¶ 11.) During his surgery, he was administered pressors[5] for low blood pressure. (*Id.*) Shivner

---

[3] The Court cites the CM/ECF page numbering on Defendants' exhibits.

[4] Grant County contracted with CorrValues to provide healthcare and emergency medical care to inmates and pretrial detainees at the GCDC. (SAC ¶¶ 5–6.)

[5] "Pressors" are medications used to treat hypotension (low blood pressure). *See Inotropes and Vasopressors*, NCMBI, https://www.ncbi.nlm.nih.gov/books/NBK482411/ (last updated Feb. 16, 2022); *Low Blood Pressure*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/low-blood-pressure/symptoms-causes/syc-20355465 (Sept. 22, 2020).

was discharged on February 12 with prescriptions for Tramadol,[6] Tylenol 3, Colace (docusate), and Zofran (a medication for nausea). (Doc. 80-C at 39.) The discharge instructions stated to call a doctor for the following concerns: "blue or gray skin color[;] continuous vomiting[;] difficulty passing urine[;] difficulty breathing[; or] any new problems or concerns." (*Id.* at 40.) Shivner received docusate twice per day from February 12–15, 2018. (*See* Doc. 80-C at 32.) He also received Tylenol 3 and Tramadol once or twice per day during that time. (*See id.*)

On February 14, 2018, Shivner completed a GCDC medical request form to ask for an eye exam and new glasses. (*Id.* at 34.) On February 15, 2018, a CorrValues healthcare contractor noted that Shivner complained of being unable to have a bowel movement and was given a dose of milk of magnesia, a laxative. (Docs. 80-A ¶ 12; 80-C at 37.) The contractor noted that Shivner had "no further complaints." (Doc. 80-C at 37.) A CorrValues Progress Note dated February 16, 2018, at 4:45 a.m. shows that the healthcare provider was called in because Shivner was still unable to have a bowel movement. (*Id.* at 35.) The provider contacted Mercado and gave Shivner half of a bottle of "mag citrate," a different laxative, because the milk of magnesia was "not working." (*See id.*; *see also* Doc. 80-A ¶ 12.) Another Progress Note labeled 4:45 a.m. reflects a direction from Mercado that "if vomiting continues, give Phenergan"[7] and "if no changes send out to ER." (Doc. 80-C at 36.) At 5:30 a.m., Shivner was "on toilet attempting to [have a bowel movement], states feels like can go now, but is uncomfortable." (*Id.* at 35.) "Per Dr. Mercado if he hasn't gone, please

---

[6] Tramadol is an opioid that may cause constipation. *See Does Tramadol cause constipation?*, Drugs.com, https://www.drugs.com/medical-answers/tramadol-constipation-3554202/ (last updated Nov. 16, 2020).

[7] Phenergan is a medication that "treats nausea and vomiting or pain after surgery." *Phenergan*, Drugs.com, https://www.drugs.com/phenergan.html (last updated Feb. 7, 2022).

13

send to ER." (*Id.*) The provider notified "Sgt. Fisher, will get someone to come in if need arises." (*Id.*)

Michael Bonenfant authored a GCDC Incident Report, stating that at 7:30 a.m. on February 16, 2018, Sgt. Fischer reported that Shivner "needed to be transported to GRMC per medical." (*Id.* at 53.) When Bonenfant went to get Shivner, he found him "constantly yelling in pain and throwing up on the floor of his cell and booking." (*Id.*) Bonenfant escorted Shivner to the hospital via ambulance. (*Id.*) Emergency room staff evaluated Shivner and admitted him for dehydration, intractable nausea, vomiting, and severe constipation. (Doc. 80-E at 9.) He was referred for radiology and other tests and given IV fluids and an "aggressive bowel regimen." (*Id.*)

At 11:50 p.m., Shivner went into "[a]cute respiratory failure questionably secondary to acute aspiration . . . ." (*Id.* at 25.) Medical staff bagged and eventually intubated Shivner but did not perform CPR, as he never lost pulse. (*Id.*) The GRMC Progress Note stated that Shivner had pulled out his NG tube[8] twice "and did not want it back in." (*Id.*) Given Shivner's symptoms and updated blood work, the GRMC provider diagnosed "likely ischemic bowel"[9] and consulted another physician about possible surgery. (*Id.*) On the morning of February 17, 2018, Shivner underwent a "colectomy for gangrenous colon." (*Id.* at 11.) After his surgery, medical staff extubated Shivner, and he told them "that he [did] not want to go back on the machine ever." (*Id.* at 12.) Plaintiff confirmed to medical staff that Shivner had a "Do Not Resuscitate" order. (*Id.*)

---

[8] "A nasogastric tube (NG tube) is a special tube that carries food and medicine to the stomach through the nose." *Nasogastric feeding tube*, Medline Plus, https://medlineplus.gov/ency/patientinstructions/000182.htm (last reviewed Nov. 2, 2020).

[9] "Intestinal ischemia . . . describes a variety of conditions that occur when blood flow to your intestines decreases due to a blocked blood vessel . . . ." *Intestinal ischemia*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/intestinal-ischemia/symptoms-causes/syc-20373946 (June 19, 2020). "If blood flow to your intestine is completely and suddenly blocked, intestinal tissue can die (gangrene)." *Id.*

GRMC staff put him on a BiPap machine overnight,[10] but Shivner informed GRMC staff on the morning of February 20 that he did not want to use the BiPap machine anymore. (*Id.*) Shivner's "condition deteriorated and . . . he was tried on oxygen but he even remove[d] the oxygen[,] not wanting it." (*Id.* at 12, 18.) GRMC staff assessed "a very small pneumothorax on the right" and "pulmonary vascular congestion."[11] (*Id.* at 19.) Shivner died at 1:12 p.m. on February 20, 2018, of "[a]cute respiratory failure secondary to a combination of pneumonia, volume overload, small pneumothorax[, and s]eptic shock secondary to diffuse gangrenous colon." (*See id.* at 11–12, 17.)

## 2.    Expert opinions regarding Shivner's illness and death

Sarah Allen, M.D., CorrValues's medical expert, opined that the circumstances of Shivner's surgery likely led to ischemic bowel. (*See* Doc. 80-A ¶ 11.) She explained that he was hypotensive and received pressors during surgery, "both of which can compromise blood supply to the bowel." (*Id.*) Together with the anesthesia and tranexamic acid[12] administered during surgery on February 12, these factors "likely caused a blood clot, blocking circulation to Mr. Shivner's bowel." (*Id.*; *see also* Doc. 80-D at 9–10.) "Furthermore, the narcotics, Zofran, and general anesthesia medications administered to Mr. Shivner more likely than not contributed to constipation and stool impaction, as did [his] likely dehydration, given that he was not to eat or drink prior to the surgery." (Doc. 80 ¶ 11.)

---

[10] A bilevel positive airway pressure ("BiPap") machine "is a type of ventilator . . . that helps with breathing." *What is BiPap?*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/bipap (last visited Mar. 24, 2022).

[11] "Pneumothorax, also called a collapsed lung, is when air gets between one of your lungs and the wall of your chest." *Pneumothorax*, WebMD, https://www.webmd.com/lung/what-is-a-collapsed-lung#1 (last visited Mar. 24, 2022). "Pulmonary vascular congestion means the blood vessels in your lungs are engorged" and "is commonly associated with congestive heart failure or simply heart failure." *Vascular congestion*, Health Jade, https://healthjade.net/vascular-congestion/ (last visited Mar. 24, 2022).

[12] Tranexamic acid is a medication used to reduce blood loss during orthopedic surgery. *Tranexamic acid for the prevention and management of orthopedic surgical hemorrhage: current evidence*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4556304/ (Aug. 25, 2015).

Allen opined that "[t]o a reasonable degree of medical probability," CorrValues's contractors' "administration of docusate to Mr. Shivner during his incarceration was reasonable and adequate and did not cause or contribute to [his] development of severe constipation and ischemic bowel." (*Id.* ¶ 14.) She found that CorrValues contractors' decisions on February 15–16, 2018—to offer laxatives, to wait 15–20 minutes after Shivner "thought he was going to be able to have a bowel movement[,]" and to take additional time to arrange for transport to the hospital— were reasonable. (*Id.* ¶¶ 12–13.) Allen opined that Shivner's condition "was not diagnosable by CorrValues contractors[,] as ischemic bowel "is extremely rare in an individual of [his] age" and his symptoms "did not, without more information, indicate an ischemic bowel." (*Id.* ¶ 8.)

Allen further opined that an "earlier arrival at the hospital on February 16, 2018," would not "have altered the course of Mr. Shivner's subsequent treatment, or his prognosis." (*Id.* ¶ 15.) GRMC staff treated Shivner for stool impaction but did not suspect ischemic bowel until 16 "hours after his admission, when [his] respiratory failure and updated labs indicated that possibility." (*Id.*) It was not until GRMC staff performed surgery on February 17, 2018, that they discovered "Shivner's diffusely gangrenous colon." (*Id.*) "There is no basis for a conclusion that Mr. Shivner's arrival at the hospital three hours earlier on the morning [of] February 16, 2018[,] would have led to different treatment or earlier recognition" of ischemic bowel, "nor would it have altered Mr. Shivner's subsequent refusal of respiratory support, or his ensuing death from respiratory failure." (*Id.*) Allen opined that the care CorrValues contractors provided to Shivner "met the applicable standard of care, to a reasonable degree of medical probability." (*Id.* ¶ 7.)

Gary M. Vilke, M.D., CorrValues's second medical expert, agreed that the care CorrValues and its contractors provided Shivner "met the applicable standard of care, to a reasonable degree of medical probability." (Doc. 80-B ¶ 7.) Vilke explained that "Shivner was consistently and

regularly attended to by medical staff during his incarceration." (*Id.* ¶ 8.) Contractors evaluated Shivner when he made medical complaints; "Shivner had direct communication with and access to medical personnel on multiple occasions, multiple times per day; and" contractors "administered appropriate medications . . . ."[13] (*Id.*) "Shivner was treated promptly, and appropriate referrals were made for his presenting medical conditions and symptoms." (*Id.*) Vilke found "no evidence of inadequate staffing by CorrValues, nor . . . evidence that the CorrValues contractors were inadequately trained or supervised." (*Id.* ¶ 9.) "Shivner's care was provided by licensed, qualified healthcare professionals who rendered and provided medically-necessary care . . . ." (*Id.*)

Theodore Davis, M.D., the Board's medical expert, opined that "there is no information contained in the reviewed records that provides a medical basis to support a conclusion that actions or inactions of GCDC or its employees caused or contributed to Mr. Shivner's bowel/colon problems . . . ." (Doc. 81-B at 13.) Davis noted that Shivner's conduct in pulling out the NG tube, put in place "to help keep his stomach from building up fluid and to prevent vomiting[,]" may have led to Shivner's vomiting incident in which he "aspirated stomach contents into his lungs, which precipitated a code blue" and later intubation. (*Id.* at 13–14.) "This aspiration resulted in a lung infection and a cascade of serious medical complications." (*Id.* at 14.) Davis ultimately opined that "there is no medical basis to support a conclusion that the actions of GCDC or its employees in some manner caused or contributed to a consequential delay in [Shivner's] transfer for medical

---

[13] Jurado testified that "Shivner asked me repeatedly for pain medication, which he was not getting[,]" and that after Shivner's follow-up surgery, he "was not given the medications the hospital ordered." (Doc. 96-1 ¶¶ 13, 16.) Freemen stated that Shivner "was rarely given medications for pain" and that medications were not administered "regularly or consistently." (Doc. 96-3 ¶¶ 10–11.) Plaintiff alleges that her witnesses' testimony shows that the medical records may "be unreliable" (Doc. 96 at 4), but the Court finds that this testimony does not contradict the medical records, which show that Shivner received medications *up to* two times per day—a fact the experts considered. (*See, e.g.*, Docs. 80-A ¶ 14; 80-C at 27–33.) At least one expert, Allen, also observed that CorrValues contractors modified Shivner's prescribed medications. (Doc. 80-A ¶ 14.) Regardless, Plaintiff has not established that either lay witness is qualified to opine on the propriety of Shivner's medication schedule.

evaluation and treatment, . . . to the occurrence of . . . his medical conditions," or to his hospitalization or death. (*Id.*)

### 3. Plaintiff's claims and testimony

Plaintiff filed her Second Amended Complaint on March 24, 2021, and brings six claims:

Count I: Failure to train and supervise under 42 U.S.C. § 1983, against the Board and John/Jane Does. (SAC ¶¶ 52–65.)

Count II: State law claim for negligence against all Defendants. (*Id.* ¶¶ 66–78.)

Count III: Negligent operation of a medical facility under the New Mexico Tort Claims Act (NMTCA), § 41-4-9, against the Board. (*Id.* ¶¶ 79–84.)

Count IV: Negligent operation of a building under NMTCA § 41-4-6, against the Board. (*Id.* ¶¶ 85–90.)

Count V: Negligent hiring, training, and supervision under the NMTCA, against the Board, the GRMC Defendants, and CorrValues. (*Id.* ¶¶ 91–97.)

Count VI: State law claim for medical negligence against CorrValues, the GRMC Defendants, and John/Jane Does. (*Id.* ¶¶ 98–108.)

Plaintiff was deposed in November 2021. (*See* Doc. 81-A at 1.) She testified that she had no evidence to show that GCDC employees fell below the standard of care "unless they were working hand-in-hand with CorrValues." (*Id.* at 68:1–8.) She further admitted that she has no "evidence that Mr. Shivner requested medical attention from a [GCDC] guard and the guard did not pass along the request." (*Id.* at 69:22–25.)

Regarding the care Shivner received at GRMC, Plaintiff testified that his doctor, "Dr. Sherpa[,] was a wonderful, wonderful doctor" whom she talked to "[t]oo many [times] to count." (Doc. 82-B at 74:2–12.) She had no "criticisms of Dr. Sherpa's care." (*Id.* at 75:15–17.) Plaintiff

stated that she talked to someone – a doctor or nursing staff – every two hours. (*Id.* at 74:13–25.)
She only had criticisms regarding one GRMC doctor, an unnamed doctor in the ER. (*Id.* at 75:15–
22.) Plaintiff thought the ER doctor was "inappropriate" because he was going to release Shivner
after he'd given him an enema, even though "he did not know what was wrong with him." (*Id.* at
75:20–76:6.) Plaintiff asserts "that isn't how you would treat a patient until you know what is
wrong with the patient." (*Id.* at 76:7–9.) Plaintiff acknowledged that the ER doctor did not release
Shivner, but that a "hospitalist took over, and [Shivner] ended up going into surgery right away."
(*Id.* at 76:18–22.) Plaintiff stated that other than the unnamed ER doctor, there was no other GRMC
provider whose care was inappropriate. (*Id.* at 77:7–10.)

### C.      Count I: The Court will dismiss the § 1983 claim.

In Count I, Plaintiff brings a claim against the Board and John/Jane Doe employees for
failure to train or supervise under 42 U.S.C. § 1983. (*See* SAC ¶¶ 52–65.) She asserts that the
GCDC violated Shivner's substantive due process "right to bodily integrity and personal security"
when it hired the Doe defendants "knowing they lacked the requisite experience and training
necessary to monitor the medical needs of detainees with sensitive health issues, assess emergency
medical situations and, when necessary, administer emergency aid, thereby creating an
unreasonable risk of harm to GCDC detainees, such as [Shivner]." (*Id.* ¶¶ 57–58.) She alleges that
GCDC's "acts and omissions were pursuant to policy and custom of providing inadequate medical
care and catastrophically delaying administration of medications violated" Shivner's constitutional
rights and "indicate[] Defendants' deliberate indifference to the health and safety of the detainees
and arrestees at GCDC." (*Id.* ¶¶ 60–61.)

The Board argues that Plaintiff fails to provide evidence to establish that any GCDC
employee violated Shivner's constitutional rights. (Doc. 81 at 7–8.) Because Plaintiff fails to show

an underlying constitutional violation, the Board argues that her claim for failure to train or supervise must also fail. (*See id.*) The Court agrees. The Tenth Circuit has found that a municipality is typically not "liable for constitutional violations when there was no underlying constitutional violation by any of its officers." *Strain v. Regalado*, 977 F.3d 984, 997 (10th Cir. 2020), *cert. denied*, 142 S. Ct. 312 (2021) (quotation omitted). "A claim for inadequate medical attention will be successful if the plaintiff shows deliberate indifference to serious medical needs." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quotation marks and citation omitted). Plaintiff must establish an objective and a subjective component. *See id.* "The objective component of the test is met if the 'harm suffered rises to a level "sufficiently serious" to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Id.* (quoting *Mata v. Saiz*, 427 F.3d 745, 752–53 (10th Cir. 2005)). To show the subjective component, Plaintiff "must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id.* at 1089 (quotation omitted). "The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Id.* (quoting *Mata*, 427 F.3d at 753).

The Board argues that Plaintiff cannot establish the subjective component. (Doc. 81 at 8.) Plaintiff testified that she had no evidence to show that GCDC employees fell below the standard of care "unless they were working hand-in-hand with CorrValues." (Doc. 81-A at 68:1–8.) She admitted that she has no "evidence that Mr. Shivner requested medical attention from a guard and the guard did not pass along the request." (*Id.* at 69:22–25.) Even if the Court were to consider the affidavits Plaintiff attached to her reply brief on her motion to extend, there is no evidence to show that *GCDC employees* recklessly disregarded a risk of harm. (*See* Docs. 96-1–3.) Indeed, the two GCDC employees testified that they expressed concern for Shivner, but it was the CorrValues

20

medical staff who refused to do more to alleviate his discomfort. (*See, e.g.*, 96-1 ¶¶ 21, 24; 96-2 ¶¶ 11–12.) Because Plaintiff has not shown an underlying constitutional violation by any of GCDC's officers, the Board cannot be liable for a claim for failure to train or supervise. *See Strain*, 977 F.3d at 997. The Court will grant the Board's motion and dismiss Count I.

### D. The Court will dismiss the state law negligence claims.

"New Mexico has enacted a limited waiver of liability for common law tort claims against state employees in the NMTCA." *Garcia v. Martinez*, 414 F. Supp. 3d 1348, 1357 (D.N.M. 2019) (citing N.M. Stat. Ann. § 41-4-1–30). "Unless excepted, a 'governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort.'" *Id.* (quoting N.M. Stat. Ann. § 41-4-4). Plaintiff bases Count II (state law claim for negligence against all Defendants) on a theory that Defendants "failed to provide [Shivner] with reasonably obtainable and necessary medical care, follow-up medical treatment, supervision, medication, and emergency medicine." (SAC ¶ 68.) She asserts that immunity is waived for Count II under NMTCA §§ 41-4-10 and 41-4-12. (*Id.* ¶¶ 72, 78.) She bases Count III (negligent operation of a medical facility against the Board) on the GCDC's failure "to operate [its] medical facility in a manner that ensured [Shivner] would receive prompt and necessary medical treatment." (*Id.* ¶ 81.) She asserts that the Board's immunity is waived under § 41-4-9. (*Id.* ¶ 83.) Plaintiff bases Count IV (negligent operation of a building against the Board) on the GCDC's negligent failure "to ensure that medical care was provided to detainees . . . ." (*Id.* ¶ 87.) She believes immunity is waived under § 41-4-6. (*Id.* ¶ 90.) In Count V (negligent hiring, training, and supervision against the Board, the GRMC Defendants, and CorrValues), Plaintiff contends that Defendants hired inadequately trained employees and failed to supervise their provision of medical care, which proximately caused Shivner's death. (*Id.* ¶¶ 91–97.) Plaintiff does not identify a waiver of

immunity for Count V. (*See id.*) Finally, Plaintiff bases Count VI (medical negligence against CorrValues, the GRMC Defendants, and Jane/John Does) on a failure to properly diagnose Shivner, provide proper care, and to manage and monitor the clinic. (*Id.* ¶¶ 98–108.) Plaintiff does not identify a waiver of immunity for Count VI. (*See id.*) The Court will examine each Defendant's arguments separately below.

### 1. CorrValues

CorrValues argues that Plaintiff may not establish her state law negligence claims without expert testimony. (*See* Docs. 80 at 10–21.) Plaintiff brings Counts II, V, and VI against CorrValues: all are premised on allegations that CorrValues's negligence in providing adequate medical care caused Shivner's injuries and death. (SAC ¶¶ 66–78, 91–108.)

> It is well established in New Mexico that:
> In order to prove medical malpractice, a plaintiff has the burden of showing that (1) the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the duty by departing from the proper standard of medical practice recognized in the community; and (3) the acts or omissions complained of proximately caused the plaintiff's injuries.

*Baer v. Regents of Univ. of Cal.*, 688, 884 P.2d 841, 844 (N.M. Ct. App. 1994) (quoting *Blauwkamp v. Univ. of N.M. Hosp.*, 836 P.2d 1249, 1252 (N.M. Ct. App.), *cert. denied*, 835 P.2d 80 (N.M. 1992)) (subsequent citations omitted); *see also Siebert v. Okun*, 485 P.3d 1265, 1271 (N.M. 2021) (noting that the substantive elements of medical malpractice and medical negligence are the same). The first element (existence of a medical duty) involves a question of law. *Salzman v. United States*, No. CV 18-779 CG/LF, 2020 WL 134214, at *3 (D.N.M. Jan. 13, 2020) (citing *Blake v. Pub. Serv. Co. of N.M.*, 82 P.3d 960, 962 (N.M. Ct. App. 2003)). The second and third elements (breach and causation) are questions of fact "for the jury to determine, unless reasonable

minds can draw only one conclusion." *Id.* (citing *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1333–34 (10th Cir. 2017)).

"New Mexico requires a plaintiff to use expert testimony 'in most medical malpractice suits' to prove all three negligence elements: 'to establish a standard of care, to assess the [healthcare provider's] performance in light of the standard, and to prove causation.'" *Holley v. Evangelical Lutheran Good Samaritan Soc.*, 588 F. App'x 792, 795 (10th Cir. 2014) (quoting *Gerety v. Demers*, 589 P.2d 180, 191 (1978)) (subsequent citations omitted). "This rule requiring expert testimony stems from the fact that medical malpractice actions often involve 'technical and specialized subject matter,' *Lopez v. Sw. Cmty. Health Servs.*, 833 P.2d 1183, 1188 (N.M. Ct. App. 1992), that is not within the 'common knowledge ordinarily possessed by an average person,' *Gerety*, 589 P.2d at 195." *Holley*, 588 F. App'x at 795. "But New Mexico recognizes an exception to the requirement of expert testimony if the subject matter of a medical malpractice action does fall within an average layperson's 'common knowledge.'" *Id.* (quoting *Gerety*, 589 P.2d at 195) (subsequent citation omitted).

### a.      Standard and Breach

Plaintiff has a two-fold burden to establish that CorrValues breached the standard of care. *See id.* First, she "must present testimony regarding the applicable standard of care." *Salzman*, 2020 WL 134214, at *4 (citing *Richter v. Presbyterian Healthcare Servs.*, 326 P.3d 50, 64 (N.M. Ct. App. 2014)). Second, she must show that CorrValues's "conduct fell below that standard." *Id.* (citing *Richter*, 326 P.3d at 64). "Ordinarily, in a medical malpractice action, a plaintiff must demonstrate breach of the standard of care by using expert testimony." *Id.* (citing *Nicholson v. Evangelical Lutheran Good Samaritan Soc'y, Inc.*, No. CIV-16-0164 JB/KK, 2017 WL 3127799, at *28 (D.N.M. July 21, 2017)). To that end, "the New Mexico Uniform Jury Instructions direct

jurors to assess whether the physician 'possessed and applied the knowledge and used the skill and care which the law required of him[/her]' supported by 'evidence presented in this trial by doctors testifying as expert witnesses.'" *Id.* (quoting UJI 13-1101 NMRA). CorrValues argues that Plaintiff cannot meet this burden because she failed to identify an expert witness on the standard of care and breach. (Docs. 80 at 10; 95 at 6–7.)

Plaintiff alleges that CorrValues was "required to use the ordinary care of a reasonably well-operated medical clinic furnishing medical services to [Shivner], and to have policies and procedures in place that would ensure that [he] would receive that standard of care." (SAC ¶ 99.) She also asserts that CorrValues "violated the standard of care for health care providers in New Mexico" by, for example, "[f]ailing to properly diagnose [Shivner's] medical condition;" "[f]ailing to provide proper care for [Shivner's] condition;" "[f]ailing to provide proper emergency care under the circumstances;" and "[f]ailing to properly manage and monitor the clinic so as to prevent injury to" Shivner. (*Id.* ¶ 107.) In the briefing on her motion to extend, Plaintiff fails to cite a single case in support of her position that she does not need an expert to establish the elements of negligence under circumstances comparable to those here. (*See* Docs. 91; 96.)

The New Mexico Supreme Court has explained:

It is not mandatory in every case that negligence of the doctor be proved by expert testimony which shows a departure from reasonable standards of care. Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care. However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential.

*Toppino v. Herhahn*, 673 P.2d 1297, 1300 (N.M. 1983) (quoting *Pharmaseal Lab'ys, Inc. v. Goffe*, 568 P.2d 589, 594 (N.M. 1977)). In *Toppino*, the court found that "the jury would not have had to make medical determinations" in order to find that a surgeon had misplaced an improperly sized

breast implant over the course of five surgeries, particularly because another surgeon fixed the problems "after only one surgical procedure." *Id.* at 1300–01 (citation omitted). In *Helfferich v. Corrections Medical Services, Corizon*, the court found that a plaintiff did not need expert testimony to establish a standard of care where he complained that the defendant failed "to treat his cavities for a period of over a year, despite his consistent complaints of pain and requests for treatment." No. 32,749, 2013 WL 7752644, at *2 (N.M. Ct. App. Dec. 9, 2013). "Defendant's failure to provide any treatment at all, for an extended period of time, is not a matter that is exclusively within the ken of an expert medical provider." *Id.* (citation omitted). In *Eis v. Chesnut, M.D.*, the defendant surgeon operated on the plaintiff's hip and leg, placing a pin at the lower end of the femur. 627 P.2d 1244, 1245 (N.M. Ct. App. 1981). The radiology report showed "that the pin protruded into the soft tissues" near the joint, and the plaintiff "complained of intense knee pain" to the surgeon for five months after the operation. *Id.* He gave her medications for pain. *Id.* She went to another surgeon with the same complaint; he took an x-ray that showed the prosthesis inserted by the defendant "was protruding out from the femur and impaling the patella or kneecap." *Id.* The second surgeon performed corrective surgery that alleviated the plaintiff's pain. *Id.* The court found that the plaintiff did not need expert testimony to establish negligence in the defendant's failure to diagnose the cause of her pain because the cause was so obvious. *Id*. at 1246. In so holding, the court noted that "a plaintiff must offer expert testimony to defeat a defendant's motion for summary judgment when the defendant has presented expert testimony that he was not negligent and the issue is the propriety of a certain surgical procedure." *Id.*

Here, the issues largely center around the propriety and timing of the CorrValues contractors' care, treatment, diagnosis, and transfer of Shivner. (*See* SAC.) Through its own expert witnesses, Drs. Allen and Vilke, CorrValues presents evidence that the contractors' treatment of

Shivner "met the applicable standard of care . . . ." (Docs. 80-A ¶ 7; 80-B ¶ 7.) Allen testified that ischemic bowel "is extremely rare in" someone Shivner's age, and his "symptoms while at the [GCDC] . . . did not, without more information, indicate an ischemic bowel." (Doc. 80-A ¶ 8.) She opined that "[i]t cannot be determined with precision when [his] ischemic bowel began to develop" and that "his condition was not diagnosable by CorrValues contractors." (*Id.* ¶¶ 8–9.) Vilke testified that the CorrValues "contractors met the applicable standard of care" by "consistently and regularly attend[ing] to" Shivner's medical needs, evaluating and communicating with him multiple times per day, prescribing and administering appropriate medications, and promptly treating his medical conditions and symptoms. (Doc. 80-B ¶¶ 7–8.) Where CorrValues has submitted evidence to demonstrate its contractors did not breach the applicable standard of care and these issues involve complex medical decisions made pursuant to the contractors' training and expertise, Plaintiff may not withstand summary judgment without expert testimony. *See Holley*, 588 F. App'x at 786 (noting that "Plaintiffs recognize[d] that they needed expert testimony to establish that [defendant] breached the [standard of care] . . . because the determination . . . involves the exercise of medical judgment"). "Rather, a medical expert is necessary to evaluate the quality and nature of the medical treatment provided for" Shivner's medical conditions. *See, e.g.*, *Clements v. GEO Grp., Inc.*, No. CIV 15-1017 MV/KBM, 2017 WL 3207156, at *11 (D.N.M. July 27, 2017), *R&R adopted*, 2017 WL 4443454 (D.N.M. Oct. 3, 2017) (finding that, "without any expert medical testimony or other support for his negligence claims" to rebut the defendant's expert's medical opinions on the standard of care or breach, no genuine issues of fact existed regarding an inmate's complaint that handcuffing caused injuries to shoulders); *see also Sherman v. Anasazi Med. Assocs.*, No. 35,151, 2016 WL 1546446, at *1 (N.M. Ct. App. Mar. 1, 2016) (finding that "expert testimony was needed to address whether [defendants'] treatment of

Plaintiff[,]" including a medical decision concerning administration of medication, "fell below the requisite standard of care").

#### b.      Causation

The Court finds that Plaintiff is also required to submit expert testimony to establish the causation element. "Under New Mexico law, it is well-settled that the plaintiff bears the burden of proof on medical causation, and [she] cannot prevail on the issue of medical causation without expert testimony directly supporting [her] conclusion." *Smith v. Auto-Owners Ins. Co.*, No. 15-CV-1153 SMV/GBW, 2017 WL 3223952, at *2 (D.N.M. July 27, 2017) (citing *Woods v. Brumlop*, 377 P.2d 520, 523 (N.M. 1962) ("[T]he cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion."); *Baca v. Bueno Foods*, 766 P.2d 1332, 1334 (N.M. Ct. App. 1988) ("To prove a proposition to a reasonable medical probability requires expert medical testimony establishing that the proposition is more likely than not.")). "Having said that, 'such [expert] testimony is not always necessary' to establish medical causation." *Id.* at *3 (quoting *Folz v. New Mexico*, 797 P.2d 246, 260 (N.M. 1990)). "This is especially the case 'where exceptional circumstances within common experience or knowledge of the layman are present[.]'" *Id.* (quoting *Cervantes v. Forbis*, 389 P.2d 210, 213 (N.M. 1964)). "In determining whether 'exceptional circumstances' exist, New Mexico trial courts apply a reasonableness standard: that is, a plaintiff is required to produce an expert 'when the trial court reasonably decides that it is necessary to properly inform the jurors on the issues.'" *Id.* (quoting *Folz*, 797 P.2d at 260). "Thus, the Court must decide whether an expert witness is necessary to establish the cause of" Shivner's illness and death, "or whether causation is straightforward and simple enough that a lay juror could reasonably figure out causation based on common experience or knowledge." *See id.*

Considering the circumstances here, the Court finds that Plaintiff is required to present expert testimony to connect Shivner's medical conditions and death to CorrValues's contractors' decisions regarding his treatment and transfer. The Court found above that Plaintiff's motion to extend should be denied, barring her submission of the lay witness affidavits. Even were the Court to consider Plaintiff's proffered affidavits, they do not provide evidence that shows Shivner's symptoms or conditions are so "within the common knowledge and experience of laymen . . . that a layman would have no difficulty in recognizing [them] as having been caused by negligence." *See Harvey v. United States*, No. 08CV107 MCA/CG, 2011 WL 13174559, at *7 (D.N.M. June 30, 2011) (quotation omitted).[14]

Plaintiff submits testimony from Javier Jurado, a former Sergeant at GCDC, and Michael Freemen, a GCDC inmate who was housed in the unit next to Shivner, both of whom provide testimony about Shivner's symptoms from February 12–16, 2018. (Docs. 96-1; 96-3.) Jurado described Shivner's severe pain, nausea, vomiting, and constipation, and his later lack of movement or talking.[15] (*Id.* ¶¶ 13, 18–19, 23.) Drs. Allen and Vilke also considered these symptoms and found that CorrValues adequately managed them *and* found that the symptoms did

---

[14] The *Harvey* Court applied Arizona caselaw in examining a claim for medical negligence. *See Harvey*, 2011 WL 13174559, at *7. Arizona law, like that in New Mexico, "mirrors the general common law rule," requiring expert medical testimony in medical malpractice actions" unless the "injury is within the common knowledge and experience of laymen." *Id.*; *see also, e.g.*, *Toppino*, 673 P.2d at 1300.

[15] Jurado testified that Shivner displayed additional symptoms that were not listed in the materials Defendants submitted. For example, he described Shivner's grey and ashy skin, excessive sweating, and an overwhelming and unusual odor he smelled once when Shivner belched. (Doc. 96-1 ¶¶ 12, 19.) Yet there is no evidence that any CorrValues contractor was aware of these symptoms. Further, Plaintiff offers no authority to support a finding that a layperson would understand that failing to address these symptoms constitutes medical negligence.

Additionally, Jurado stated that in the days after his second surgery, Shivner "seemed confused, couldn't balance himself, and could not speak clearly." (Doc. 96-1 ¶ 17.) Again, there is no evidence that a CorrValues contractor was aware of or ignored these symptoms. Jurado testified that "[t]hese are symptoms that first responders are taught to look for in post-operative patients who are not healing well." (*Id.*) This statement implies that this knowledge is outside the realm of a layperson.

not indicate ischemic bowel. (Docs. 80-A ¶¶ 8, 12–13; 80-B ¶ 8.) Jurado stated that Shivner asked for medications more times than the contractors provided it and that the contractors did not provide Shivner with the medications the hospital ordered. (*See* Doc. 96-1 ¶¶ 13, 16, 22.) Yet, Drs. Allen and Vilke considered the medication schedule and found that the contractors' treatment was adequate. (*See* Docs. 80-A; 80-B.) Plaintiff presents no authority to establish that Shivner's condition or diagnosis, which Allen called "exceedingly rare," is within the common knowledge of a layperson. Similarly, Plaintiff cites no caselaw to show that a layperson could determine whether the administration of medications proximately caused Shivner's illness or death. *See Sherman*, 2016 WL 1546446, at *1.

Plaintiff also presents testimony from Fischer, a former Sergeant with the GCDC. (Doc. 96-2.) Fischer testified that he arranged for Shivner's transportation "to GRMC over continued objection by [CorrValues] staff, who apparently did not believe his condition was grave." (Doc. 96-2 ¶ 12.) Plaintiff does not assert that CorrValues contractors *prevented* Shivner's transfer. If her argument rests on a belief that Shivner's condition was made worse by a delay caused by a CorrValues contractor, the Court finds that she would need an expert witness on the issue. "Timing challenges almost by definition require an assessment of urgency, and that assessment requires expert testimony." *Richter*, 326 P.3d at 57.

Plaintiff also argues that the Court should apply the doctrine of *res ipsa loquitor*, which allows a jury to infer negligence when an injury "was proximately caused by [the provision of medical services] which was [CorrValues's] responsibility to manage and control; and . . . the event causing the injury . . . was of a kind which does not ordinarily occur in the absence of" the defendant's negligence. (*See* Doc. 96 at 9 (quoting UJI 13-1623 NMRA).) Plaintiff raises this point for the first time in her reply brief to her motion to extend. (*See* Docs. 91; 96 at 9.) Thus, the Court

finds that she has waived this argument. *See, e.g.*, *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) ("In this Circuit, we generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived.") (citations omitted).

Even if the Court were to consider the argument, however, it would not change the outcome here. "Res ipsa loquitur is applicable only when it is a matter of common knowledge among laymen or medical [experts], or both, that the injury would not ordinarily have occurred if due care had been exercised." *Harvey*, 2011 WL 13174559, at *7 (quotation omitted); *cf. Mireles v. Broderick*, 872 P.2d 863, 866 (N.M. 1994) (allowing "expert witness testimony to establish the inference of negligence" and clarifying that "[t]he common-knowledge exception to the expert testimony rule may inform but does not delimit the application of res ipsa loquitur"). The Court has already found that Shivner's medical conditions and death are not within the common knowledge among laymen, and Plaintiff has failed to submit an expert witness on the subject, thus failing to create a genuine dispute of fact on the elements of her claim. *See Montano v. Centurion Correctional Healthcare of N.M., LLC*, No. CV 15-415 KG/LF, 2019 WL 3539845, at *2 (D.N.M. Aug. 2, 2019) (granting summary judgment to defendant on medical negligence claim where plaintiff, who had a "complex medical history and multiple ailments [that did] not come within an average layperson's common knowledge[,]" did not submit medical expert testimony). "Although res ipsa loquitur may apply to medical malpractice actions as one form of circumstantial evidence, the doctrine does not relieve plaintiff from making a prima facie case." *Schmidt v. St. Joseph's Hosp.*, 736 P.2d 135, 137 (N.M. Ct. App. 1987) (citations omitted). Because Plaintiff has failed to demonstrate an issue of fact on any of the elements of her medical negligence claim, the doctrine of res ipsa loquitur will not save her claims. *See id.* Accordingly, the Court grants summary judgment to CorrValues on Counts II and VI.

Similarly, the Court will grant summary judgment to CorrValues on Count V—the claim for negligent hiring, training, and supervision. CorrValues asserts that Plaintiff must submit expert testimony "to establish the standard of care for the administration of services in a prison facility, given the professional judgment involved in policy-making, hiring, and operational decisions on issues of inmate safety and health." (Doc. 80 at 17 (citing *Villalobos v. Bd. of Cnty. Comm'rs of Dona Ana Cnty.*, 322 P.3d 439, 440–42 (N.M. Ct. App. 2014)).) The Court agrees. In *Villalobos*, the plaintiff asserted that the defendant "[d]etention [c]enter breached its duty to provide adequate means and staff to monitor inmate behavior[ ] and to adequately train and supervise staff." *Villalobos*, 322 P.3d at 440 (quotation marks omitted). The county defendants moved for summary judgment and "provided evidence through expert testimony that the [d]etention [c]enter met or exceeded accepted standards in the adult detention corrections field, including with regard to staffing and monitoring of detainees/inmates, classification of inmates, and with respect to its policies, procedures, and post orders." *Id.* at 440–41. The plaintiff did not submit any expert testimony on the issues and argued "that she neither needed an expert to establish any standard of care County Defendants owed her nor any duty breached and that the district court erred in ruling that she needed an expert to help establish these facts." *Id.* at 441. The state appellate court disagreed and found that "in order for a jury to make a decision regarding the standard of care of the monitoring by prison officials in this instance, expert testimony is required." *Id.* at 442. In *Grassie v. Roswell Hospital Corp.*, the court of appeals found that the plaintiff's negligent hiring claim failed for lack of an expert. 258 P.3d 1075, 1090 (N.M. Ct. App. 2010).

The same is true here, where Plaintiff seeks to hold CorrValues liable for negligence "in the hiring, training, and supervision of its employees in a manner that provided the detainees . . . with reasonable medical care and treatment." (SAC ¶ 92.) Plaintiff does not submit expert

testimony to establish a relevant standard of care, nor does she argue that her three proffered affidavits would provide evidence sufficient to meet her burden on this claim. (*See* Docs. 91; 96.) Moreover, Plaintiff's claim for failing to hire, train, and supervise employees is based on her allegations of medical negligence. (*See* SAC ¶¶ 91–97.) Plaintiff has not cited authority to show that this claim has any legs where her claim for medical negligence fails.

### 2.    The Board

The Court dismisses Plaintiffs' state law negligence claims (Counts II, V, VI) against the Board for the same reason—Plaintiff's failure to submit expert testimony. The Board submitted expert testimony from G. Theodore Davis, M.D. (Doc. 81-B.) Davis opined that Shivner's "clinical course . . . was complex." (*Id.* at 14.) He further opined that "there is no medical basis to support a conclusion that the actions of GCDC or its employees in some manner caused or contributed to a consequential delay in his transfer for medical evaluation and treatment, or caused or contributed to" his medical conditions, hospitalization, or death. (*Id.*) Nothing in Plaintiff's lay witness testimony is sufficient to create a genuine issue of fact on medical negligence. Likewise, Plaintiff has no expert testimony on the question of negligent hiring, training, or supervision and thus cannot establish a genuine dispute of fact regarding Count V.

With respect to Count III brought under N.M. Stat. Ann. § 41-4-9, the Board argues that the claim fails under the decision in *Lessen v. City of Albuquerque*, 187 P.3d 179 (N.M. Ct. App. 2008). (*See* Doc. 81 at 14.) In *Lessen*, the plaintiff sued a county detention center and alleged in relevant part that, pursuant to § 41-4-9, it was responsible for the death of her son, an inmate. *See* 187 P.3d at 180, 185. The court found that because the detention center contracted medical care to another entity (CMS), the county was not liable under § 41-4-9, which "waives immunity for 'liability for damages resulting from bodily injury, wrongful death or property damage caused by

the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.'" *Id.* at 185. "Because it was CMS that operated the infirmary[,]" summary judgment in favor of the detention center was proper on the claim under § 41-4-9. *Id.* The same is true here—CorrValues operates the medical facility within GCDC.

With respect to Count IV, the claim for "negligent operation of a building" under § 41-4-6, Plaintiff affirmatively testified that she "has no evidence that any [GCDC] guard failed to pass along all of Mr. Shivner's requests to medical." (*See* Doc. 81 at 7 (citing Doc 81-A).) She also agreed that she did not "have any evidence that [she] can point to that [GCDC] did fall below the standard of care." (Doc. 81-A at 68:22–25.) Moreover, the Board argues that Plaintiff has submitted no evidence to establish that the Board's conduct created a danger to a class of users of the building, as is required to make out a claim under § 41-4-6. (Doc. 81 at 14.) *See also Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006), *as revised* (Sept. 12, 2006). Plaintiff did not reference Counts III or IV in the briefing on her motion to extend or respond to the Board's arguments in any way. (*See* Docs. 91; 96.) For these reasons, the Court concludes that Plaintiff's state law claims should be dismissed as to the Board.

### 3.    The GRMC Defendants

Plaintiff brings three claims against the GRMC Defendants (Counts II, V, VI), and they fail for the same reasons that the Court explained above—Plaintiff fails to provide expert testimony to establish the elements of medical negligence or negligent hiring, training, and supervision.[16]

---

[16] The GRMC Defendants also argue that to the extent Plaintiff brings Count V as a common law tort of negligent hiring, it still fails because she fails to allege who was negligently hired, retained, or supervised, or to allege a "causal connection" between the negligent act and the harm Shivner suffered. (Doc. 82 at 15 (citing *Lessard v. Coronado Paint & Decorating Ctr., Inc.*, 168 P.3d 155, 165 (N.M. Ct. App. 2007); *Ovecka v. Burlington N. Santa Fe Ry. Co.*,

Nor do Plaintiff's lay witnesses make allegations to support any claim of negligence against the GRMC Defendants. (*See* Docs. 96-1–3.) With no evidence to support her claims, Counts II, V, and VI fail and the Court grants the GRMC Defendants' motion for summary judgment.[17]

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Motion for Leave to Respond to Defendants' Motions for Summary Judgment (Doc. 91) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' Motions for Summary Judgment (Docs. 80; 81; 82) are **GRANTED**;

**IT IS FURTHER ORDERED** that this matter is **DISMISSED WITH PREJUDICE**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

194 P.3d 728, 736–37 (N.M. Ct. App. 2008)).) Plaintiff fails to address this point and thus waives it. (*See* Docs. 91; 96.)

[17] The GRMC Defendants also contend that the ER physician is an independent contractor, and "immunity is not waived for independent contractors under the NMTCA." (Doc. 82 at 16–17.) Plaintiff fails to respond to this argument (*see* Docs. 91; 96) and thus waives it. The Court finds that it need not reach the issue, however, because of the complete lack of evidence to establish a claim against the GRMC Defendants.